RYAN P. STEEN, Bar No. 0912084
ryan.steen@stoel.com
JASON T. MORGAN, Bar No. 1602010
jason.morgan@stoel.com
STOEL RIVES LLP
600 University Street, Suite 3600
Seattle, WA 98101
Telephone: 206.624.0900

*Attorneys for Plaintiff ConocoPhillips Alaska, Inc.*

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| CONOCOPHILLIPS ALASKA, INC., <br><br> Plaintiff, <br><br> v. <br><br> DEPARTMENT OF INTERIOR; SECRETARY DEBRA HAALAND, in her official capacity as Secretary of U.S. Department of Interior; and U.S. BUREAU OF LAND MANAGEMENT, <br><br> Defendants. | Case No. 3:24-cv-00142 <br><br> **COMPLAINT** <br><br> (Naval Petroleum Reserves Production Act, 42 U.S.C. §§ 6501 *et seq.*; National Environmental Policy Act, 42 U.S.C. §§ 4231 *et seq.*, Administrative Procedure Act, 5 U.S.C. §§ 701-706) |

## <u>SUMMARY OF ACTION</u>

1.      ConocoPhillips Alaska, Inc. ("CPAI" or "Plaintiff") challenges the Bureau of Land Management's ("BLM") new regulations governing oil and gas activities in the National Petroleum Reserve in Alaska (the "Petroleum Reserve" or "NPR-A"). Specifically, on May 7, 2024, BLM issued final regulations that drastically and

**COMPLAINT**
*ConocoPhillips Alaska, Inc. v. Department of the Interior, et al.*, 3:24-cv-00142

fundamentally change the priorities, substantive standards, and processes for management and administration of the Petroleum Reserve (the "Rules"). 89 Fed. Reg. 38,712 (May 7, 2024). Among other changes, BLM created a presumption against any petroleum-related activities in "Special Areas," which currently comprise more than half of the Petroleum Reserve, and granted itself unfettered discretion to expand (but not reduce) those Special Areas without limitation. Outside of those Special Areas, BLM granted itself unfettered discretion to delay or deny any oil and gas activities for any reason BLM sees fit, including on the basis of undefined "uncertainty."

2.      In establishing the Petroleum Reserve, Congress required BLM to expeditiously foster petroleum production in the NPR-A, subject to reasonable mitigation measures, and plainly did not authorize BLM to promulgate sweeping regulations that thwart and prevent the production of petroleum throughout the NPR-A, as the Rules do. The Rules are *ultra vires*, arbitrary, capricious, and contrary to law, and must be set aside.

3.      The Petroleum Reserve encompasses 22.8 million acres of land on Alaska's North Slope. President Harding established the Petroleum Reserve for future use by the Navy as "Naval Petroleum Reserve No. 4" in 1923 "for oil and gas only." Exec. Order No. 3797-A (Feb. 27, 1923). The United States Geological Survey ("USGS") estimates that the NPR-A contains 8.7 billion barrels of oil and 25 trillion cubic feet of natural gas.

4.      In 1980, Congress re-purposed the Petroleum Reserve to help meet the Nation's oil and gas needs amidst a national energy crisis. An embargo by the Organization of Petroleum Exporting Countries ("OPEC") made it clear to Congress that

**COMPLAINT**
*ConocoPhillips Alaska, Inc. v. Department of the Interior, et al.*, 3:24-cv-00142
2
Case 3:24-cv-00142   Document 1   Filed 07/05/24   Page 2 of 45

"the Nation had a need for oil that exceeded the needs of the Navy." *N. Alaska Env't Ctr.*

*v. Norton*, 361 F. Supp. 2d 1069, 1072 (D. Alaska 2005), *aff'd sub nom*. *N. Alaska Env't*

*Ctr. v. Kempthorne*, 457 F.3d 969 (9th Cir. 2006).

5.     In response to this crisis, Congress amended the Naval Petroleum Reserves

Production Act ("NPRPA") authorizing privately funded exploration, development, and

production in the Petroleum Reserve. *See* Pub. L. No. 96-514, 94 Stat. 2957 (1980). As

Alaska Senator Ted Stevens explained at the time, "we can no longer delay efforts which

would increase the domestic supply of oil and lessen our reliance on imports." 126 Cong.

Rec. S29489 (1980). To underscore the urgency of the legislation, Congress instructed

the Secretary of the Interior to carry out "an expeditious program" of oil and gas leasing

in the NPR-A. 42 U.S.C. § 6506a(a).

6.     The resulting statute, as amended, is unique amongst land management

statutes. It is a dominant-use statute, establishing the Petroleum Reserve's primary

purpose as the expeditious production of oil to meet the Nation's energy needs. Unlike

other BLM-managed lands, the Petroleum Reserve is not subject to wilderness

designation. *See* 42 U.S.C. § 6506a(c) (exempting NPR-A from the wilderness-study

requirements of 43 U.S.C. § 1782). Nor is the Petroleum Reserve subject to the Federal

Land Policy and Management Act's ("FLPMA") multiple-use, sustained-yield

management mandates and related obligations that apply to other BLM-managed lands.

42 U.S.C. § 6506a(c) (exempting NPR-A from the land-use planning requirements of 43

**COMPLAINT**
*ConocoPhillips Alaska, Inc. v. Department of the Interior, et al.*, 3:24-cv-00142

3

U.S.C. § 1712). For more than four decades, BLM has recognized Congress' intent that the dominant use of the Petroleum Reserve is petroleum production.

7. The goal of the NPRPA leasing program is to encourage private companies to invest significant resources in the exploration and development of the Petroleum Reserve. To do so, Congress structured the leasing program to provide the conditions necessary to support prudent investment by private industry. For example, Congress added the exclusions from wilderness study and FLPMA planning because "the administrative requirements of these sections inhibit expeditious leasing." *See* H. Rep. No. 96-1147 at 33 (July 2, 1980). Likewise, Congress authorized extended lease terms and larger lease tracks because of the "high risk and severe conditions" faced by private developers in the Petroleum Reserve.

8. BLM immediately recognized these Congressional goals, issuing regulations in 1981 that were "designed to expedite the exploration, development and production of oil and gas resources in the" Petroleum Reserve and, at the same time, "balance energy development with environmental protection and subsistence values, especially in areas of critical wildlife habitat or subsistence use." 46 Fed. Reg. 37,725 (July 22, 1981). Consistent with Congressional instruction, BLM proceeded to offer leases under this program, granting the exclusive right to develop all of the oil and gas on the leases and build any necessary infrastructure to do so.

9. CPAI answered Congress' call for private investment in the Petroleum Reserve. CPAI currently holds 156 leases in the Petroleum Reserve, including 82 leases

**COMPLAINT**
*ConocoPhillips Alaska, Inc. v. Department of the Interior, et al.*, 3:24-cv-00142
4
Case 3:24-cv-00142   Document 1   Filed 07/05/24   Page 4 of 45

in areas designated as Special Areas. CPAI has invested billions of dollars to purchase leases, explore the Petroleum Reserve, and responsibly develop leases subject to some of the most stringent environmental protections in the world. CPAI is currently producing oil on leases in the Greater Mooses Tooth Unit of the Petroleum Reserve, and construction is underway on the Willow project in the Bear Tooth Unit of the Petroleum Reserve. These projects will support both local economies and national energy security needs for many years to come.

10.     In promulgating the Rules, BLM has attempted to override and evade clear Congressional mandates, changing the management priority for the Petroleum Reserve from expeditious leasing and production to meet the Nation's energy needs to creating "maximum protection" of surface values and prohibiting development activities. BLM ignored Congress' direction and made a unilateral policy choice that 13 million acres of the Petroleum Reserve are "too special to develop" for oil and gas and should instead be preserved as wilderness areas, and gave itself unlimited authority to expand those "too special" 13 million acres at will.[1]

11.     The Rules include numerous new provisions that elevate resource preservation over energy production and effectively turn the Petroleum Reserve into a de facto wilderness area in which development is outright prohibited, presumed to be

---

[1] *See* U.S. Dep't of the Interior, Biden-Harris Administration Takes Critical Action to Protect Alaska Native Subsistence, Lands and Wildlife (Apr. 19, 2024), https://www.doi.gov/pressreleases/biden-harris-administration-takes-critical-action-protect-alaska-native-subsistence.

**COMPLAINT**
*ConocoPhillips Alaska, Inc. v. Department of the Interior, et al.*, 3:24-cv-00142

prohibited, or subject to delay or denial at BLM's whim based on undefined "uncertainty" and other factors.

12.     For example, the Rules "codif[y]" five "Special Areas" in the Petroleum Reserve and determine that "the management priority within Special Areas is to assure maximum protection of significant resource values." 89 Fed. Reg. at 38,712. BLM expansively defines "Special Areas" to include "any surface value" that BLM "identifies as significant." *Id*. at 38,723. The Rules also create an entirely new process for expanding Special Areas (to any lands BLM "identifies as significant") and establish an entirely new "presumption" against any oil and gas activities in those Special Areas.

13.     Congress did not intend the Petroleum Reserve be turned into an ever-expanding wilderness area. BLM has no authority to change the management priority mandated by Congress for the Petroleum Reserve. If Congress had intended to grant BLM the discretion to turn more than 13 million acres of the Petroleum Reserve into an undevelopable wilderness area, it would have expressly said so. *Biden v. Nebraska*, 143 S. Ct. 2355, 2372 (2023). Instead, Congress did the opposite by expressly prohibiting BLM from setting aside *any* NPR-A lands as wilderness. 43 U.S.C.§ 6506a(c). The Rules thus exceed BLM's authority and conflict "with the statutory language and past practice under the statute." *Biden,* 143 S. Ct. at 2372.

14.     The Rules also arbitrarily contradict and override BLM's own past practice, interpretation of the statute, and implementation through integrated activity plans ("IAPs"). Since at least 1998, BLM has used the IAP process to determine which NPR-A

**COMPLAINT**
*ConocoPhillips Alaska, Inc. v. Department of the Interior, et al.*, 3:24-cv-00142
6
Case 3:24-cv-00142   Document 1   Filed 07/05/24   Page 6 of 45

lands to lease and the appropriate best management practices, stipulations, and conditions to apply to oil and gas activities. Each IAP was supported by a robust public process and preparation of a comprehensive environmental impact statement ("EIS") under the National Environmental Policy Act ("NEPA"). All of CPAI's leases in the Petroleum Reserve, including the 82 leases in Special Areas, are located in areas that BLM's *current* IAP has designated as "open" to oil and gas leasing and "available for new infrastructure." But the Rules capriciously reverse course, determining that all Special Areas, including those that are "open" to oil and gas development under the current IAP, have a presumption against that same development. BLM fails to even acknowledge, let alone explain, this reversal. Moreover, unlike every IAP, BLM failed to conduct any environmental analysis to support the Rules, in direct violation of NEPA.

15.    The Rules also conflict with and undermine the Congressionally mandated expeditious leasing program. Congress sought to remove "the administrative requirements" that "inhibit expeditious leasing," yet BLM has now created those exact same impediments through the Rules.

16.    The Rules purport to give BLM unfettered discretion to delay or deny lawful oil and gas activities throughout the entire Petroleum Reserve. The Rules *require* BLM to "ensure" that undefined "uncertainty" is taken into account in decisions to delay or deny activities. These provisions, among others, undermine an expeditious leasing program and infuse uncertainty in permitting that will drive away the private investment in the Petroleum Reserve expressly sought by Congress. The Rules are thus antithetical to

**COMPLAINT**
*ConocoPhillips Alaska, Inc. v. Department of the Interior, et al.*, 3:24-cv-00142

the statute's primary purpose of expeditiously producing oil and gas to meet the energy needs of the Nation.

17.     Not only do the Rules conflict with the Congressionally mandated purpose of an expeditious leasing program, but they ignore, contradict, and conflict with, BLM's own leasing program regulations. BLM's leasing program regulations, in place since 1981 at 43 C.F.R. part 3130, are designed to facilitate the Congressional purpose of carrying out an expedited program of leasing, development and production, while achieving the Congressionally desired "balance" between development and protection of environmental values. 46 Fed. Reg. at 37,725. The Rules ignore the balance struck by the leasing program regulations and instead delay, impede, and frustrate the required expeditious leasing program. The Rules also undermine and violate the investment-backed expectations and rights of leaseholders who purchased Petroleum Reserve leases based on Congress' expressly stated intent to expeditiously carry out a successful leasing program to develop and produce oil from the Petroleum Reserve.

18.     For all these reasons, and those set forth below, the Rules should be vacated in their entirety.

**PARTIES**

**Plaintiff**

19.     CPAI is Alaska's largest oil producer and has a corporate heritage of leading oil and gas exploration, development, and production in the State going back more than 50 years. CPAI  holds 1.8 million acres of state and federal leases in Alaska,

**COMPLAINT**
*ConocoPhillips Alaska, Inc. v. Department of the Interior, et al.*, 3:24-cv-00142

including 1 million net undeveloped acres as of year-end 2023. CPAI has major ownership interests in two of North America's largest legacy oil fields on Alaska's North Slope—Kuparuk, which the company operates, and Prudhoe Bay. CPAI also operates several fields on the Western North Slope.

20.     CPAI works with Alaska residents and government leaders to ensure that sustainable oil and gas development helps build a future for all Alaskans. CPAI's approach to sustainable development includes a commitment to creating value and improving living standards for local stakeholders while moving the business forward and meeting current and future energy needs.

21.     CPAI currently holds approximately 1,029,043 acres of leases in the NPR-A, including approximately 559,984 acres in lands designated as Special Areas. CPAI acquired these leases over multiple decades, through public lease sales in which leases were awarded to the highest bidders. Each lease grants "the exclusive right to drill for, mine, extract, remove, and dispose of all of the oil and gas . . . together with the right to build and maintain necessary improvement thereupon." CPAI paid BLM initial bids to purchase those leases and pays annual rent on those leases.

22.     CPAI has taken a careful, progressive approach to that development. Following many years of exploration activities in the NPR-A, CPAI completed construction of the Colville Delta 5 ("CD5") satellite drill site in 2015. This was followed by the GMT1 satellite drill site, which began production in 2018, and the GMT2 drill site, which began production in 2022. Presently, CPAI is in the process of constructing the

**COMPLAINT**
*ConocoPhillips Alaska, Inc. v. Department of the Interior, et al.*, 3:24-cv-00142

Willow project in the Bear Tooth Unit of the NPR-A (including in Special Areas). Willow is estimated to increase the throughput in the Trans-Alaska Pipeline System by approximately 35% and to be approximately 40% of CPAI's production in Alaska in 2030.

23. CPAI has a demonstrated commitment to working with local stakeholders who rely on the Petroleum Reserve for subsistence to ensure that development occurs in a manner that protects important environmental and subsistence values. For example, the Willow project meticulously and holistically designed to avoid and minimize impacts on environmental and subsistence values. Among other things, Willow will use extended-reach underground horizontal drilling, allowing the project to access most of the oil underlying the 195,709-acre unit of leased lands using only three 15-acre drill pads and a total surface footprint of only about 384 acres, including the access road. The Willow project is also subject to over 250 impact minimization measures and permanently preserves over 800 acres of pristine North Slope wetlands.

24. Petroleum Reserve development projects have undeniable public benefit.

25. For example, the Willow project will generate $7.6 billion in federal revenues, $2.6 billion of which will be made available to North Slope communities via the NPR-A Mitigation Grant Program. Willow will provide $2.3 billion for the State of Alaska in production, property, and income taxes. It will produce another $1.2 billion for the North Slope Borough in ad valorem taxes—funding schools, emergency response, health clinics, water facilities, roads, waste facilities, and power facilities across all eight

**COMPLAINT**
*ConocoPhillips Alaska, Inc. v. Department of the Interior, et al.*, 3:24-cv-00142
10
Case 3:24-cv-00142   Document 1   Filed 07/05/24   Page 10 of 45

North Slope villages. Willow will support 2,500 construction jobs and 300 long-term jobs. All of these benefits will come from the environmentally responsible production of 600 million barrels of domestic oil that would otherwise be produced overseas, thereby increasing domestic oil supply from the Petroleum Reserve.

26.     Indeed, in enacting the NPRPA, Congress intended to reduce U.S. reliance on foreign oil.

27.     CPAI has prospects and leads for potential new development areas on leases within the NPR-A. CPAI has already substantially invested in many of these leases, not only through its initial bids and annual rents but also through investing in exploration activities. All of these prospects will require additional exploratory and appraisal drilling to determine technical and economic feasibility before they are ready to be included in a development proposal to BLM. CPAI has conducted exploratory operations in the NPR-A during most winters for the last 10 years and intends to continue to do so. CPAI intends to continue exploring its leasehold positions, but this is now in question because of the Rules and the arbitrary and uncertain new requirements they impose.

28.     CPAI has standing to challenge the Rules. The Rules put future development and exploration of CPAI's leases at risk and cause immediate injury to the company. The Rules create a presumption that oil and gas activities will not be permitted in Special Areas, thereby immediately injuring the value of CPAI's leases and either precluding future development or making it substantially more difficult and onerous. The

**COMPLAINT**
*ConocoPhillips Alaska, Inc. v. Department of the Interior, et al.*, 3:24-cv-00142
11
Case 3:24-cv-00142   Document 1   Filed 07/05/24   Page 11 of 45

Rules' new procedural requirements further injure CPAI by causing delay in permit processing, thereby reducing the value of leases and increasing the probability of lease expiration.

29.     Indeed, the Rules have already caused delays in permit approvals. CPAI had a pending application with BLM for a five-year right-of-way to gather data and conduct monitoring, some of which is required mitigation for ongoing operations. BLM delayed issuing the requested right-of-way because it was carrying out new processes established by, and applying the new standards applicable under, the Rules. This delay associated with even a minor permit approval creates significant regulatory uncertainty for any future exploration or development project, thwarting the purpose of the leasing program, undermining CPAI's ability to continue investing in exploration and development, and devaluing the company's leases in the NPR-A.

30.     Likewise, BLM's failure to comply with NEPA and its failure to analyze the impacts of the Rules cause procedural injury to CPAI as well as injuries to CPAI's interests in sustainable development of the NPR-A and its longstanding interests in working with local communities and stakeholders to ensure responsible development of the Petroleum Reserve.

31.     Vacatur of the Rules is required to redress these injuries. The challenged agency decisions are final and ripe for review by this Court.

**COMPLAINT**
*ConocoPhillips Alaska, Inc. v. Department of the Interior, et al.*, 3:24-cv-00142

**Defendants**

32.     Defendant BLM is an agency of the United States Department of the Interior charged with management of the Petroleum Reserve under the NPRPA. BLM promulgated the Rules.

33.     Defendant Department of the Interior is an agency of the United States responsible for oversight of BLM.

34.     Defendant Debra Haaland is sued in her official capacity as Secretary of the United States Department of the Interior. The Secretary holds the highest position within the Department of the Interior, has ultimate responsibility for overseeing the Department and its agencies and ensuring their compliance with all applicable federal laws, and has specific responsibilities related to the administration of the NPR-A.

## JURISDICTION AND VENUE

35.     This Court has jurisdiction over this action pursuant to 5 U.S.C. §§ 701-706 (Administrative Procedure Act ("APA")), 28 U.S.C. § 1331 (federal question), 28 U.S.C. § 2201 (declaratory judgments), and 28 U.S.C. § 2202 (injunctive relief).

36.     Defendants have waived sovereign immunity in this action pursuant to 5 U.S.C. § 702.

37.     Plaintiff has exhausted all administrative remedies.

38.     Venue is properly vested in this Court under 28 U.S.C. § 1391(e) because the activities, land, and leases at issue in and affected by the Rules are located in this

**COMPLAINT**
*ConocoPhillips Alaska, Inc. v. Department of the Interior, et al.*, 3:24-cv-00142
13
Case 3:24-cv-00142   Document 1   Filed 07/05/24   Page 13 of 45

district, and a substantial part of the acts or omissions giving rise to this controversy occurred in this district.

## STATUTORY FRAMEWORK

### The Administrative Procedure Act

39.    The APA provides for judicial review of final agency action. 5 U.S.C. § 702. Under the APA, a reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" (*id.* § 706(2)(A)), "contrary to constitutional right, power, privilege, or immunity" (*id.* § 706(2)(B)), or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right" (*id.* § 706(2)(C)). A reviewing court shall also "hold unlawful and set aside agency action, findings, and conclusions found to be . . . without observance of procedure required by law." *Id.* § 706(2)(D). BLM regulations are subject to judicial review under the APA.

### The Naval Petroleum Reserves Production Act

40.    The NPRPA is codified at 42 U.S.C. §§ 6501-6507. The NPRPA transferred jurisdiction over the Petroleum Reserve from the Navy to the Secretary of the Interior on June 1, 1977. 42 U.S.C. § 6503(a). The Secretary of Interior has delegated those duties to BLM.

41.    Under the NPRPA, the primary purpose of the NPR-A is for oil and gas leasing and production to meet the energy needs of the Nation.

**COMPLAINT**
*ConocoPhillips Alaska, Inc. v. Department of the Interior, et al.*, 3:24-cv-00142

14

42.    The NPRPA requires the Secretary to "conduct an expeditious program of competitive leasing of oil and gas in the [Petroleum] Reserve." 42 U.S.C. § 6506a(a).

43.    Congress chose to incentivize a private leasing program after decades of federal exploration in the Petroleum Reserve failed to locate commercially recoverable quantities of oil, despite the expenditure of hundreds of millions of dollars exploring the Petroleum Reserve.

44.    The NPR-A is not subject to FLPMA requirements for land use planning or wilderness study.

45.    The NPRPA requires BLM to use a bidding system for leasing that is based on the bidding systems included in the Outer Continental Shelf Lands Act Amendments of 1978. 42 U.S.C. § 6506a(f). The NPRPA required BLM to conduct the first lease sale in 1980. Since 1999, BLM has held lease sales in the Petroleum Reserve almost every year. However, the last lease sale in the Petroleum Reserve occurred in 2019.

46.    The current Presidential Administration has held zero lease sales in the Petroleum Reserve and has announced no plans to do so.

47.    BLM's NPR-A leases were sold with the stated expectation that the leased lands could be developed for oil and gas production.

48.    NPR-A leases grant "the exclusive right to drill for, mine, extract, remove and dispose of all the oil and gas (except helium) in the lands described" in the lease, "together with the right to build and maintain necessary improvements thereupon for the term" of the lease. Leases are subject to "regulations and formal orders in effect as of

**COMPLAINT**
*ConocoPhillips Alaska, Inc. v. Department of the Interior, et al.*, 3:24-cv-00142
15
Case 3:24-cv-00142   Document 1   Filed 07/05/24   Page 15 of 45

lease issuance, and to regulations and formal orders hereafter promulgated when not inconsistent with lease rights granted or specific provisions of a lease."

49.     NPR-A leases do not include a "no surface occupancy" reservation.

50.     The right and expectation to develop NPR-A leases is an essential component of the leasing program. Given the difficulty and expense of exploring for oil in the Petroleum Reserve, no reasonable oil and gas operator would purchase NPR-A leases and invest millions of dollars to explore for oil on those leases if the leases contained a no surface occupancy reservation.

51.     Exploration is a prerequisite to discovery of oil resources.

52.     The development of leases may require a lease holder to build roads and pipelines on portions of the Petroleum Reserve that are not leased by the developing company.

53.     The NPRPA requires that "[a]ctivities undertaken pursuant to [the NPRPA] shall . . . provide for such conditions, restrictions, and prohibitions as the Secretary deems necessary or appropriate to mitigate reasonably foreseeable and significantly adverse effects on the surface resources of the [NPR-A]." 42 U.S.C. § 6506a(b).

54.     BLM's promulgation of the Rules is a final agency action subject to judicial review under the APA.

**The National Environmental Policy Act**

55.     "Congress enacted NEPA to establish a national policy for the environment." *Mountain Cmtys. for Fire Safety v. Elliott*, 25 F.4th 667, 674 (9th Cir.

**COMPLAINT**
*ConocoPhillips Alaska, Inc. v. Department of the Interior, et al.*, 3:24-cv-00142

2022). NEPA requires federal agencies to take a "hard look" at the environmental consequences of their actions. NEPA requires federal agencies to perform certain environmental analyses before taking any "major federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C).

56.     NEPA "'does not mandate particular results'" and "'imposes only procedural requirements to ensure that the agency, in reaching its decision, will have available, and will carefully consider, detailed information concerning significant environmental impacts.'" *Env't Prot. Info. Ctr. v. Carlson*, 968 F.3d 985, 988 (9th Cir. 2020) (quoting *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 23 (2008)). An agency can comply with NEPA in three ways: (1) it can prepare an EIS; (2) it can prepare an Environmental Assessment ("EA"); or (3) it can invoke a Categorical Exclusion ("CE") to avoid preparing an EIS or EA. *Friends of the Inyo v. U.S. Forest Serv.*, 103 F.4th 543 (9th Cir. 2024) (internal quotation marks and citation omitted).

57.     CEs represent a "more expedited track available for a limited set of agency actions ... 'that normally do not have a significant effect on the human environment.'" *Earth Island Inst. v. Muldoon*, 82 F.4th 624, 632 (9th Cir. 2023) (quoting 40 C.F.R. § 1501.4(a)). Invoking an exclusion allows an agency to avoid preparing an EIS or EA so long as no "extraordinary circumstances" indicate that the action will nonetheless have a significant environmental effect. *Id*.

58.     BLM produced a list of categorically excluded actions at 43 C.F.R. § 46.210. BLM's regulations categorically exclude, among other things: "Policies,

**COMPLAINT**
*ConocoPhillips Alaska, Inc. v. Department of the Interior, et al.*, 3:24-cv-00142
17
Case 3:24-cv-00142   Document 1   Filed 07/05/24   Page 17 of 45

directives, regulations, and guidelines: that are of an administrative, financial, legal, technical, or procedural nature; or whose environmental effects are too broad, speculative, or conjectural to lend themselves to meaningful analysis and will later be subject to the NEPA process, either collectively or case-by-case." 43 C.F.R. § 46.210(i).

59.    BLM's decision to apply a CE is a final agency action subject to judicial review under the APA.

## STATEMENT OF FACTS

### The NPR-A and Its Early Exploration

60.    The Petroleum Reserve is "roughly the size of Indiana" and "home to numerous Native Alaska communities that practice a subsistence way of life, relying on the biological resources of the Reserve." *N. Alaska Env't Ctr. v. U.S. Dep't of Interior*, 983 F.3d 1077, 1081 (9th Cir. 2020). President Harding established the NPR-A on Alaska's North Slope in 1923 "for oil and gas only." Exec. Order No. 3797-A. The NPR-A was designated as a national defense reservoir under the jurisdiction of the Navy and viewed as a possible petroleum supply source during a military emergency. However, the remote location of the NPR-A and the harsh Arctic climate made exploration and extraction logistically challenging.

61.    From 1923 to 1926, the USGS conducted the initial fieldwork to map the NPR-A. Subsequently, the threat of oil shortages during World War II prompted the Navy to accelerate its petroleum exploration program. *See* George Gryc, The National Petroleum Reserve in Alaska, Earth-Science Considerations, USGS Professional Paper

**COMMPLAINT**
*ConocoPhillips Alaska, Inc. v. Department of the Interior, et al.*, 3:24-cv-00142
18
Case 3:24-cv-00142   Document 1   Filed 07/05/24   Page 18 of 45

1240-C (1985) ("Paper 1240-C"). As a result, the Navy, in cooperation with the USGS, began an exploration program in the NPR-A that lasted from 1944 to 1953. *Id*. at C14. This was the first-ever Arctic oil and gas exploration project. It resulted in 36 test wells and discovery of oil deposits at Umiat, Cape Simpson, and Fish Creek. *Id*.

62.     The discovery of oil and gas at Prudhoe Bay in 1968, in combination with the OPEC oil embargo in 1974, prompted the Navy to propose, and Congress to approve, the next exploration program in the NPR-A. *See id*. at C15. Between 1974 and 1977, the Navy drilled seven test wells in the northeast corner of the Petroleum Reserve. *Id*. The Navy also drilled four wells in the Barrow area and discovered the east Barrow gas field, providing an additional supply of gas for local use.

63.     These early explorations were significant undertakings, with a single test well costing the federal government about $100 million. *Id*. at C30. They also left behind "unsightly reminders of human activity," including tracks across the tundra, excavated drill sites, installation of pilings, and open reserve pits. *Id*. at C49, C70, C72-75.

**Public Law 94-258 (April 5, 1976)**

64.     In 1976, amidst continuing oil shortages, Congress redirected the purpose of the NPR-A because "the Nation had a need for oil that exceeded the needs of the Navy." *N. Alaska Env't Ctr.*, 361 F. Supp. 2d at 1072. On April 5, 1976, Congress passed Public Law 94-258 to establish "national petroleum reserves the development of which needs to be regulated in a manner consistent with the total energy needs of the Nation, and for other purposes." Title I specifically addressed the NPR-A.

**COMPLAINT**
*ConocoPhillips Alaska, Inc. v. Department of the Interior, et al.*, 3:24-cv-00142
19
Case 3:24-cv-00142   Document 1   Filed 07/05/24   Page 19 of 45

65.     Section 102 of Public Law 94-258 withdrew the NPR-A from all forms of entry and disposition under the public land laws.

66.     Section 103 of Public Law 94-258 transferred jurisdiction of the NPR-A from the Navy to the Secretary of the Interior, effective June 1, 1977.

67.     Section 104 of Public Law 94-258 instructed the Secretary how to administer the NPR-A. Congress was not then ready to authorize development of the NPR-A, so Section 104(a) instructed that "production of petroleum from the reserve is prohibited and no development leading to production of petroleum from the reserve shall be undertaken until authorized by an Act of Congress."

68.     Rather than authorize development, Congress ordered a comprehensive "Study of the Reserve" to "determine the best overall procedures to be used in the development, production, transportation, and distribution of petroleum resources in the reserve," the alternatives to those procedures, and the environmental consequences. Pub. L. No. 94-258, § 105(b). Congress also instructed the Secretary to establish a "task force" to "conduct a study to determine the values of, and best uses for, the lands contained in the reserve," and then to report on the results. Pub. L. No. 94-258, § 105(c). The Act further required the Secretary to provide the results of both the Section 105(b) and Section 105(c) studies to Congress.

69.     Although the 1976 Act did not allow either production or development leading to production in the NPR-A, it did require continuation of the federal exploration program. Sections 104(c) and (d) set forth the "requirements" for exploration of the NPR-

**COMPLAINT**
*ConocoPhillips Alaska, Inc. v. Department of the Interior, et al.*, 3:24-cv-00142
20
Case 3:24-cv-00142   Document 1   Filed 07/05/24   Page 20 of 45

A. The Secretary of the Navy was required to "continue the ongoing petroleum exploration program" in the NPR-A until jurisdiction was transferred to the Secretary of the Interior. Pub. L. No. 94-258, § 104(c). And the Secretary of the Interior was required to "commence further exploration of the reserve as of the date of transfer of jurisdiction." Pub. L. No. 94-258, § 104(d).

70.    As to the conduct of that exploration, the Act instructs that "[a]ny exploration within the Utukok River, the Teshekpuk Lake areas, and other areas designated by the Secretary of the Interior containing any significant subsistence, recreational, fish and wildlife, or historical or scenic value, shall be conducted in a manner which will assure the maximum protection of such surface values to the extent consistent with the requirements of this Act for the exploration of the reserve." Pub. L. No. 94-258, § 104(b). The applicable House Conference Report states that "'maximum protection of surface values' is not a prohibition of exploration-related activities within such areas," but is instead intended to ensure "that such exploration operations will be conducted in a manner which will minimize the adverse impact on the environment." H. Conf. Rep. No. 94-942, at 21 (1976).

71.    In 1977, BLM issued regulations in response to the 1976 Act. 42 Fed. Reg. 28,720 (June 3, 1977). BLM conducted an EA under NEPA to evaluate the impact of those regulations.

72.    The purposes of BLM's 1977 regulations were to "provide procedures to explore the oil and gas production potential of" the NPR-A and "to ensure protection of

**COMPLAINT**
*ConocoPhillips Alaska, Inc. v. Department of the Interior, et al.*, 3:24-cv-00142
21
Case 3:24-cv-00142   Document 1   Filed 07/05/24   Page 21 of 45

the environmental and ecological values on the reserve during the required exploration program." 41 Fed. Reg. 40,484 (Sept. 20, 1976). During the rulemaking, BLM explained that "[s]ince the Utukok River and Teshekpuk Lake areas are known to have special subsistence, ecological, and environmental significance they are identified in the Regulations to receive maximum protection under the exploration program." *Id*. at 40,484. BLM also made clear that "continuation of oil and gas exploration is a requirement of the Act." 42 Fed. Reg. at 28,720.

73. BLM designated the Utukok River Uplands, Teshekpuk Lake, and the Colville River as Special Areas in 1977. In doing so, however, it explained that "[m]aximum protection of designated special areas does not imply a prohibition of exploration or other activities," and instead contemplated that "steps to minimize adverse impacts on the existing resource values will be required and implemented." 42 Fed. Reg. 28,723 (June 3, 1977). BLM identified specific protection measures for these areas, including a restriction on low-flying aircraft during caribou calving season and date restrictions to protect migratory birds. *Id*.

74. BLM's 1977 regulations describe "maximum protection" as including but "not limited to requirements for (1) rescheduling activities and use of alternative routes, (2) types of vehicles and loadings, (3) limiting types of aircraft in combination with minimum flight altitudes and distances from identified places and (4) special fuel handling procedures." 42 Fed. Reg. at 28,722.

**COMPLAINT**
*ConocoPhillips Alaska, Inc. v. Department of the Interior, et al.*, 3:24-cv-00142
22
Case 3:24-cv-00142   Document 1   Filed 07/05/24   Page 22 of 45

### The 1980 NPR-A Leasing Program

75.     In 1979, the Department of the Interior completed its required evaluation of the NPR-A and submitted its report to Congress. *See* Final Report of the 105(b) Economic and Policy Analysis (Dec. 15, 1979). This report found that the NPR-A is "almost entirely wilderness" and contains "sizeable" oil resources between one and 16.5 billion barrels. The report also concluded that the oil resources are unevenly distributed in the Petroleum Reserve and that some of the high-petroleum-potential areas overlap with the most environmentally sensitive areas.

76.     In 1980, Congress authorized private leasing, development, and production in the NPR-A in an appropriations bill passed as part of the effort to combat the effects of the ongoing energy crisis. *See* Pub. L. No. 96-514.

77.     Key members of Congress voiced serious concerns in support of this legislation, stating that "we can no longer delay efforts which would increase the domestic supply of oil and lessen our reliance on imports," 126 Cong. Rec. S29489 (statement of Sen. Stevens), and recognizing that "[w]e are in the middle of an energy crisis," 126 Cong. Rec. H20533 (1980) (statement of Rep. McDade).

78.     Congress wanted to shift exploration efforts to the private sector because the federal program was of limited scope and expensive to maintain. *See* S. Rep. No. 96-985, at 34 (1980). Congress therefore decided to open the NPR-A to private companies interested in oil and gas leasing and exploration. *See* 126 Cong. Rec. 31,196 (1980) (statement of Sen. Stevens) ("The conferees have agreed to include language to expedite

**COMMPLAINT**
*ConocoPhillips Alaska, Inc. v. Department of the Interior, et al.*, 3:24-cv-00142
23
Case 3:24-cv-00142   Document 1   Filed 07/05/24   Page 23 of 45

private leasing and exploration of the entire National Petroleum Reserve in Alaska."). To underscore the urgency of the legislation, Congress made clear that the Secretary of the Interior was to carry out "an expeditious program" of oil and gas leasing in the NPR-A. 42 U.S.C. § 6506a(a). Congress' overriding purpose in enacting the NPRPA was to "increase domestic oil supply as expeditiously as possible." *ConocoPhillips Alaska, Inc. v. Alaska Oil and Gas Conservation Comm'n*, 660 F. Supp. 3d 822, 834 (D. Alaska 2023).

79.     Congress therefore created a new section of the NPRPA regarding the competitive leasing of oil and gas. 42 U.S.C. § 6506a. That section establishes the contours of the oil and gas leasing program and governs the mitigation applicable to the leasing program. *Id*.

80.     In the same bill, Congress continued to fund the federal exploration program. *See* H.R. Rep. No. 96-1147, at 32-33. Although Congress wanted to eventually end this program, it knew there would be a time lag between passage of the appropriations rider (which allowed private leasing in the NPR-A) and actual implementation of the leasing program. *Id.* at 32. Therefore, Congress continued to fund the government program to ensure that drilling and exploration would occur in the interim and retained Section 104 of the 1976 Act regarding the administration of the NPR-A under the federal exploration program.

81.     Congress recognized that future development would come with significant impacts. So, it instructed BLM that 50% of all receipts from sales, rentals, bonuses, and

**COMPLAINT**
*ConocoPhillips Alaska, Inc. v. Department of the Interior, et al.*, 3:24-cv-00142
24
Case 3:24-cv-00142   Document 1   Filed 07/05/24   Page 24 of 45

royalties should be given to the State of Alaska to fund public services, with priority in allocation of those funds to go to the "subdivisions of the State most directly or severely impacted by development of oil and gas leased under this Act." 42 U.S.C. § 6506a(l). Congress also instructed BLM to "provide for such conditions, restrictions, and prohibitions" on activities that are "necessary or appropriate to mitigate reasonably foreseeable and significantly adverse effects on the surface resources of the [NPR-A]." *Id*. § 6506a(b).

82.     BLM did not amend the 1977 special management regulations codified at 43 C.F.R. part 2360 in response to the 1980 legislation. BLM did, however, issue new leasing regulations in 1981 (codified at 43 C.F.R. part 3130) to implement the expedited leasing program. BLM needed separate regulations to account for the fact that Congress instructed BLM to manage lands in the NPR-A differently than other BLM lands, such as those managed under FLPMA. As BLM explained: "This final rulemaking contains the procedures that will be followed in carrying out the Congressionally approved oil and gas leasing program for the National Petroleum Reserve–Alaska, a program that will serve the national interest through the leasing and development of oil and gas resources that will reduce the dependence of the United States on foreign produced oil and gas." 46 Fed. Reg. 55,494, 55,497 (Nov. 9, 1981). The 1981 leasing regulations define "Special Areas" and explain the application of protections for Special Areas under the 1980 leasing program. These leasing program "is designed to balance energy development with

**COMPLAINT**
*ConocoPhillips Alaska, Inc. v. Department of the Interior, et al.*, 3:24-cv-00142
25
Case 3:24-cv-00142   Document 1   Filed 07/05/24   Page 25 of 45

environmental protection and subsistence values, especially in areas of critical wildlife habitat or subsistence use." 46 Fed. Reg. at 37,725.

## NPR-A Leasing, Development, and Production

83.     Pursuant to the new leasing program, BLM held lease sales in the NPR-A from 1982 through 1984.

84.     Despite Congress' desire for expedited development, the location and remoteness of the NPR-A still presented many logistical challenges. However, the discovery of oil in the Colville River Unit in the 1990s to the east of the NPR-A and the construction of CPAI's Alpine project sparked renewed interest in leasing in the Petroleum Reserve.

85.     In 1999, BLM issued its first lease sale in the NPR-A since 1984. BLM proceeded to conduct lease sales in 2000, 2002, 2004, 2006, 2008, 2010, 2011, 2012, 2013, 2014, 2015, 2016, 2017, 2018, and 2019. CPAI purchased leases from BLM in almost all of those lease sales.

86.     As Congress intended, CPAI has invested hundreds of millions of dollars in exploration activities throughout the Petroleum Reserve to identify locations with the potential for future oil and gas development and production. These exploration activities inform decisions to bid on lease sales and whether to engage in development of the leases.

87.     Starting in 1998, BLM began to develop IAPs, each supported by an EIS, to govern the NPR-A leasing program. Each IAP evaluated what areas of the NPR-A should

**COMMPLAINT**
*ConocoPhillips Alaska, Inc. v. Department of the Interior, et al.*, 3:24-cv-00142
26
Case 3:24-cv-00142   Document 1   Filed 07/05/24   Page 26 of 45

be open to leasing, and under what conditions. Each IAP also evaluated whether to change Special Areas. BLM completed a comprehensive IAP in 2013, supported by an EIS prepared in 2012. BLM completed the most recent IAP in 2022, supported by an EIS prepared in 2020. The record of decision for the 2022 IAP confirms that the "NPRPA is a dominant-use statute."

88.    Since 1980, development in the Petroleum Reserve "has come slowly," with much deliberation, study, and analysis. *N. Alaska Env't Ctr.*, 457 F.3d at 973. CPAI is developing leases, producing oil, and wants to continue to explore within the NPR-A.

89.    In 2017, CPAI completed construction of the CD5 project. The CD5 project, a satellite drill pad, is located within the boundary of the NPR-A, but on lands owned by Kuukpik Corporation. CD5 is connected to CPAI's Alpine facility by road and pipelines. CD5 was the first oil-producing project built in the NPR-A.

90.    On February 13, 2015, BLM approved construction of the GMT1 project, located in the Greater Mooses Tooth Unit in the NPR-A. The GMT1 project is connected to CD5 by road and pipeline. GMT1 began production of oil in 2018.

91.    On October 15, 2018, BLM approved construction of the GMT2 project, also located in the Greater Mooses Tooth Unit in the NPR-A. The GMT2 project is connected to GMT1 by road and pipeline. GMT 2 began production of oil in 2021.

92.    On March 12, 2023, BLM approved construction of CPAI's Willow project in the Bear Tooth Unit of the NPR-A. The Willow project is presently under construction and expected to begin producing oil in 2029. The Willow project includes construction on

**COMPLAINT**
*ConocoPhillips Alaska, Inc. v. Department of the Interior, et al.*, 3:24-cv-00142
27
Case 3:24-cv-00142   Document 1   Filed 07/05/24   Page 27 of 45

CPAI leases in the Teshekpuk Lake Special Area and is connected by road and pipeline to GMT2. BLM's right-of-way issued for the Willow project passes through the Colville River Special Area.

93. The Willow project is subject to over 250 mitigation and minimization measures. Over its lifetime, Willow will generate thousands of jobs and billions of public dollars, including tax revenues that will fund schools, emergency response, health clinics, water facilities, roads, waste facilities, and power facilities in all eight North Slope Borough villages.

## BLM's Promulgation of the Rules

94. On September 8, 2023, BLM issued a Federal Register notice "proposing a new rule to govern the management of surface resources and Special Areas in the [NPR-A]." 88 Fed. Reg. 62,025 (Sept. 8, 2023). BLM said its proposal "would revise the framework for designating and assuring maximum protection of Special Areas' significant resource values, and would protect and enhance access for subsistence activities throughout the NPR-A." *Id*.

95. On December 7, 2023, CPAI timely submitted formal public comments in response to BLM's proposed rule.

96. CPAI vigorously opposed the 2023 proposed rule as contrary to the intent and plain language of the NPRPA. The State of Alaska, all of Alaska's Congressional delegation, trade associations, and nearly all tribal governments, villages, and other entities representing Alaska Natives on Alaska's North Slope also vigorously opposed the

**COMMPLAINT**
*ConocoPhillips Alaska, Inc. v. Department of the Interior, et al.*, 3:24-cv-00142
28
Case 3:24-cv-00142   Document 1   Filed 07/05/24   Page 28 of 45

proposed rule. Aside from making limited, minor changes to the final regulations, BLM rejected and disagreed with or ignored all of those public comments.

97.     In a coordinated effort to make a media splash in advance of Earth Day, the Department of Interior and the White House publicly announced the new regulations nearly three weeks in advance of their formal issuance. On the same day these planned statements were issued, numerous environmental activist organizations released prepared statements praising the new regulations.

98.     Specifically, on April 19, 2024, the Department of Interior publicly announced its completion of the Rules. On the same day, President Biden issued a statement that his "Administration is taking action to conserve more than 13 million acres in the Western Arctic and to honor the culture, history, and enduring wisdom of Alaska Natives who have lived on and stewarded these lands since time immemorial." President Biden said the Rules reflected his Administration's commitment to "take ambitious action to meet the urgency of the climate crisis, protect America's lands and waters, and fulfill our responsibility to the next generation of Americans."

99.     On April 19, 2024, John Podesta, White House senior advisor to the President for international climate policy, issued a public statement commending the Rules and saying that the Administration "has now protected more than 41 million acres of lands and waters across the country, leaving a huge mark on the history of American conservation."

**COMMPLAINT**
*ConocoPhillips Alaska, Inc. v. Department of the Interior, et al.*, 3:24-cv-00142

100.    Also on April 19, 2024, on the heels of the federal announcements, environmental activist groups lauded the Rules as "constitut[ing] a comprehensive shift toward a more holistic conservation, climate and community-centric approach to managing public lands" (Wilderness Society) and protecting a "cherished landscape from further fossil fuel development that would threaten these irreplaceable lands and waters – and our climate" (Earthjustice). These activist groups aggressively lobbied for and supported the Rules because, in their view, "[o]il and gas drilling in the Western Arctic isn't just incompatible with the long-term survival of those who rely on these landscapes – it's incompatible with President Biden's own climate goals" (Sierra Club). They "applauded the Biden-Harris administration for protecting 13 million acres of the Western Arctic" (League of Conservation Voters) and "preserving nature and communities within the nation's largest single block of federal lands" (Natural Resources Defense Council).

101.    On May 7, 2024, the final rule implementing the new regulations (*i.e.*, the Rules) was formally published in the Federal Register. 89 Fed. Reg. 38,712 (May 7, 2024).

102.    The Rules amend the regulations established in BLM's 1977 rulemaking. The Rules do not address the 1981 regulations that apply to the ongoing 1980 leasing program.

103.    The Rules establish a new defined term (among others), "significant resource value," which is "any surface value, including subsistence, recreational, fish and

**COMPLAINT**
*ConocoPhillips Alaska, Inc. v. Department of the Interior, et al.*, 3:24-cv-00142
30
Case 3:24-cv-00142   Document 1   Filed 07/05/24   Page 30 of 45

wildlife, historical, scenic, or other surface value that the Bureau identifies as significant and supports the designation of a Special Area." 43 C.F.R. § 2361.5.

104.    The Rules define "Special Areas" to be "areas within the Reserve identified by the Secretary or by statute as having significant resource values and that are managed to assure maximum protection of such surface values, to the extent consistent with the requirements of the Act for the exploration and production of the Reserve." *Id*. This new definition conflicts with the existing definition for "Special Areas" established at 43 C.F.R. § 3130.0-5(f), which is limited to areas "having significant subsistence, recreational, fish and wildlife or historical or scenic value."

105.    The Rules purport to extend the "maximum protection" provisions of 42 U.S.C. § 6504(a) to all oil and gas activities in Special Areas of the NPR-A.

106.    The Rules mandate that, across the entire Petroleum Reserve, BLM "must protect surface resources by adopting whatever conditions, restrictions, and prohibitions it deems necessary or appropriate to mitigate reasonably foreseeable and significantly adverse effects of proposed oil and gas activities." 43 C.F.R. § 2361.10(a). According to the Rules, those conditions, restrictions, and prohibitions "may involve conditioning, delaying action on, or denying some or all aspects of proposed oil and gas activities . . . ." *Id*.

107.    Additionally, the Rules require that "[i]n assessing effects of a decision concerning proposed activity in the Reserve, the authorized officer will document consideration of any uncertainty concerning the nature, scope, and duration of potential

effects on surface resources of the Reserve and shall ensure that any conditions, restrictions, or prohibitions on proposed oil and gas activities account for and reflect any such uncertainty." *Id*. § 2361.10(b)(3). "Uncertainty" is not defined in the Rules.

108.    The Rules establish a new process for "designating, de-designating, or otherwise changing boundaries or management of Special Areas." *Id*. § 2361.30. Any such decisions must be based "solely on the presence or absence of significant resource values" and cannot consider the "existence of measures that have been or may be adopted to protect or otherwise administer those values." *Id*. § 2361.30(a)(4). The new process provides detailed procedures, to be carried out every 10 years, for the designation of, expansion of, and identification of new significant resource values in, and imposition of new measures applicable to, Special Areas. *Id*. § 2361.30(b). The new process, however, does not allow for the withdrawal or contraction of Special Areas. Instead, the Rules subject the removal of lands from Special Areas to different, more restrictive standards and prohibit BLM from removing any lands from the Teshekpuk Lake and Utukok River Uplands Special Areas. *Id*. § 2361.30(c).

109.    The Rules provide that decisions implemented under 43 C.F.R. § 2361.30 override any contrary measures in an IAP. *Id*. §§ 2361.30(b)(5), 2361.40(d).

110.    The Rules grant BLM authority to implement new interim measures applicable to lands that have not yet been designated as Special Areas but are "under consideration for designation as a new or modified Special Area" in response to "an internal or external recommendation." *Id*. § 2361.30(b)(4).

**COMPLAINT**
*ConocoPhillips Alaska, Inc. v. Department of the Interior, et al.*, 3:24-cv-00142

111. The Rules require that when BLM "designates lands as Special Areas or recognizes the presence of additional significant resource values in existing Special Areas, [it] must adopt measures to assure maximum protection of significant resource values." *Id*. § 2361.30(b)(5). "Such measures are not constrained by the provisions of the current IAP [and,] [o]nce adopted, these measures supersede inconsistent provisions of the IAP then in effect for the Reserve and will be incorporated into the IAP during the next revision or amendment." *Id*.

112. The Rules establish a new "management priority" for Special Areas. *Id*. § 2361.40.

113. The new "management priority" for Special Areas "is to assure maximum protection of significant resource values, consistent with the requirements of the act for exploration and production of the Reserve." *Id*. § 2361.40. The Rules require BLM to "fulfill this duty at each stage in the decision-making process for oil and gas activities in the Reserve, and in accordance with [enumerated] procedures." *Id*. They authorize BLM to "take such steps as are necessary to avoid the adverse effects of proposed oil and gas activities," including by "conditioning, delaying action on, or denying proposals for activities, either in whole or in part" (*id*. § 2361.40(a)) and by, *inter alia*, "specifying rates of development," "[l]imiting new infrastructure," "[l]imiting extraction of sand and gravel or withdrawal of water," and "[l]imiting types of vehicles and loadings" (*id*. § 2361.40(c)).

114. On "lands within Special Areas that are allocated as closed to leasing or unavailable to new infrastructure," the Rules allow for the approval of "new permanent infrastructure related to existing oil and gas leases only if such infrastructure is necessary to comport with the terms of a valid existing lease" and disallow all new permanent infrastructure related to future (*i.e.*, not "existing") leases. *Id*. § 2361.40(e)(3).

115. The Rules do not define or otherwise address what is "necessary to comport with the terms of a valid existing lease." BLM does not explain what the effect of this provision is or why it is necessary or appropriate given that, by the terms of NPR-A leases, all new regulations only apply to existing leases "when not inconsistent with lease rights granted or specific provisions of this lease." Although CPAI asked BLM in public comments to clarify whether any portion of the Rules applies to existing leases, BLM arbitrarily refused to do so and evaded the issue.

116. On "lands within Special Areas that are allocated as available for future oil and gas leasing or new infrastructure," the Rules require BLM to "presume that proposed oil and gas activities should not be permitted unless specific information available to [BLM] clearly demonstrates that those activities can be conducted with no or minimal adverse effects on significant resource values or unless they are necessary to comport with the terms of a valid existing lease." *Id*. § 2361.40(f). This provision applies to proposed oil and gas activities on existing Petroleum Reserve leases as well as on unleased lands.

**COMPLAINT**
*ConocoPhillips Alaska, Inc. v. Department of the Interior, et al.*, 3:24-cv-00142

117.    The Rules establish a new process that BLM must follow "[w]hen preparing an environmental analysis of proposed leasing, exploration, development, or new infrastructure in Special Areas, and reaching a final decision …." *Id*. § 2361.40(g). Among other things, this process requires BLM to "[d]ocument how the proposal falls within one of the exceptions in [*id*. § 2361(e)] or the justification for overcoming the presumption in [*id*. § 2361(f)]" and to "[d]ocument and consider any uncertainty concerning the nature, scope, and duration of potential adverse effects on significant resource values of Special Areas and ensure that any actions taken to avoid, minimize, or mitigate such effects account for and reflect any such uncertainty …." *Id*. § 2361.40(g). This process culminates in a "Statement of Adverse Effect," which must include measures BLM "will require to mitigate any residual adverse effects that cannot be avoided or minimized, including compensatory mitigation, along with an explanation of how those measures will assure maximum protection of significant resource values." *Id*. § 2361.40(g)(6).

118.    BLM's statement that the Rules "would not affect existing leases in the NPR-A" (88 Fed. Reg. at 62,026) is false.

119.    BLM's statement that the Rules do "not affect management of existing leases" (89 Fed. Reg. at 38,750) is false.

120.    BLM did not conduct an environmental assessment to evaluate the effects of the Rules.

**COMPLAINT**
*ConocoPhillips Alaska, Inc. v. Department of the Interior, et al.*, 3:24-cv-00142

121.   BLM's economic analysis for the Rules states that "[t]he proposed rule would not affect existing leases or operations in the NPR-A." That is false.

122.   BLM has already begun applying the Rules to CPAI's existing leases. BLM prepared a "Statement of Adverse Effects" under the Rules regarding CPAI's right-of-way application for monitoring and data collection. BLM failed to timely renew CPAI's right-of-way based on BLM's application of the Rules.

123.   The Office of Information and Regulatory Affairs determined that BLM's proposed rule (88 Fed. Reg. 62,025 (Sept. 8, 2023)) was "significant." BLM did not disclose the basis for that determination in either the proposed rule or the final rule implementing the Rules.

124.   BLM determined that the Rules are not "economically significant."

125.   BLM's economic analysis for the Rules contains no discussion or analysis of the economic impacts associated with less leasing, development, and production in the Petroleum Reserve caused by application of the Rules.

126.   BLM's economic analysis for the Rules contains no discussion or analysis of the public benefits of oil production from the Petroleum Reserve, such as the public benefits provided by the NPR-A Impact Mitigation Grant Program.

127.   BLM relied on its economic analysis when promulgating the Rules.

128.   The Rules will cause at least one less well site to be developed in the Petroleum Reserve than would have otherwise been developed.

**COMPLAINT**
*ConocoPhillips Alaska, Inc. v. Department of the Interior, et al.*, 3:24-cv-00142
36
Case 3:24-cv-00142   Document 1   Filed 07/05/24   Page 36 of 45

129. The Rules will have an annual effect on the economy of $200 million or more.

130. BLM claimed portions of FLPMA as authority for its promulgation of the Rules, including FLPMA's provision stating that "[i]n managing the public lands the Secretary shall, by regulation or otherwise, take any action necessary to prevent unnecessary or undue degradation of the lands." 43 U.S.C. § 1732(b). BLM provided no rational explanation in support of its reliance on FLPMA.

## FIRST CLAIM FOR RELIEF

### (Violation of the NPRPA and APA)

131. Plaintiff incorporates by reference all preceding paragraphs of this Complaint.

132. Agency decisions implementing the NPRPA are subject to judicial review under the APA, 5 U.S.C. § 706(2)(A), (B), (C), (D). Those provisions of the APA authorize reviewing courts to set aside federal agency action that is arbitrary, capricious, an abuse of discretion, in excess of statutory limitations, not in accordance with law, without observance of the procedures required by law, or in excess of statutory jurisdiction and authority. "Under the APA," it is "the responsibility of the court to decide whether the law means what the agency says." *Loper Bright Enters. v. Raimondo*, No. 22-1219, 2024 WL 3208360, at *12 (U.S. June 28, 2024) (internal quotation marks and citation omitted).

**COMPLAINT**
*ConocoPhillips Alaska, Inc. v. Department of the Interior, et al.*, 3:24-cv-00142
37
Case 3:24-cv-00142   Document 1   Filed 07/05/24   Page 37 of 45

133.    Based on the facts and reasons stated above, and the additional facts and reasons stated below, the Rules violate the NPRPA and the APA, as follows:

a.    The Rules improperly expand the application of the "maximum protection" standard from 42 U.S.C. § 6504(a) to all oil and gas activities in Special Areas of the NPR-A without statutory authority to do so and in contravention of the plain language of the NPRPA.

b.    The Rules unlawfully (i) grant BLM authority to delay or deny lawful oil and gas activities in the Petroleum Reserve (43 C.F.R. § 2361.10(a)) and (ii) require BLM to impose, in its unfettered discretion, "whatever conditions, restrictions, and prohibitions it deems necessary," including to account for undefined "uncertainty" (*id*. §§ 2361.10(a), 2361.10(b)(3)). These provisions are *ultra vires*, not in accordance with law, arbitrary and capricious, and an abuse of discretion.

c.    The Rules unlawfully define "significant resource value" as "any surface value" or any "other surface value that [BLM] identifies as significant," thereby granting BLM unfettered discretion to identify "significant resource values" in any and all areas of the Petroleum Reserve without meaningful limitation. *Id*. § 2361.5. This substantially expands BLM's authority to designate Special Areas and to condition, restrict, delay, impede, prohibit, and otherwise frustrate lawful oil and gas activities throughout the Petroleum Reserve. These provisions are *ultra vires*, not in accordance with law, arbitrary and capricious, and an abuse of discretion.

**COMPLAINT**
*ConocoPhillips Alaska, Inc. v. Department of the Interior, et al.*, 3:24-cv-00142

d. The Rules unlawfully establish a new "management priority" for the "maximum protection" of Special Areas and a "presumption" against permitting oil and gas activities in Special Areas, *id*. §§ 2361.40, 2361.40(f), in direct conflict with the NPRPA's primary purpose to expeditiously produce oil from the Petroleum Reserve. 42 U.S.C. § 6506a. These provisions create de facto wilderness areas, and are *ultra vires*, not in accordance with law, arbitrary and capricious, and an abuse of discretion.

e. The Rules unlawfully discourage, impede, restrict, and prevent oil and gas activities in Special Areas by: (i) substantially expanding BLM's authority to condition, delay, or deny lawful oil and gas activities in Special Areas (*id*. §§ 2361.40(a), 2361.40(c)); (ii) disallowing or unreasonably restricting new permanent infrastructure in Special Areas of the Petroleum Reserve (*id*. § 2361.40(e)(3)); (iii) granting BLM new authority to require "compensatory mitigation" for oil and gas activities in Special Areas (*id*. § 2361.40(g)(6)); and (iv) establishing a new, unduly burdensome, prohibitive, and unnecessarily complicated process for assessing leasing, exploration, development, or new infrastructure in Special Areas (*id*. § 2361.40(g)). These provisions are *ultra vires*, not in accordance with law, arbitrary and capricious, and an abuse of discretion.

f. The Rules unlawfully (i) grant BLM authority to expand Special Areas and designate new Special Areas and (ii) restrict BLM's authority to withdraw lands from Special Area designation. *Id*. § 2361.30(a), (b), (c). These provisions are *ultra vires*, not in accordance with law, arbitrary and capricious, and an abuse of discretion.

**COMPLAINT**
*ConocoPhillips Alaska, Inc. v. Department of the Interior, et al.*, 3:24-cv-00142
39
Case 3:24-cv-00142   Document 1   Filed 07/05/24   Page 39 of 45

g.      The Rules unlawfully (i) grant BLM unfettered discretion to impose new measures applicable in Special Areas, including measures that contradict and supersede an IAP (*id*. § 2361(b)(5)); and (ii) grant BLM new authority to implement "interim" measures applicable to lands that are not designated as Special Areas (*id*. § 2361.30(b)(4)). These provisions are *ultra vires*, not in accordance with law, arbitrary and capricious, and an abuse of discretion.

h.      The Rules arbitrarily contradict and override BLM's past practice, interpretation of the statute, and implementation of the statute through IAPs, supported by EISs. BLM arbitrarily, capriciously, and unlawfully fails to acknowledge or explain this reversal of practice and policy. The Rules arbitrarily conflict with the existing regulations that govern management of oil and gas activities in Special Areas under the NPRPA leasing program at 43 C.F.R. part 3130, including but not limited to the definition of "Special Areas" at 43 C.F.R. § 3130.0-5(f) and the "Special stipulations" provisions at 43 C.F.R. § 3131.3. BLM's failure to acknowledge the conflict or attempt to reconcile or explain the conflict during the rulemaking process is also arbitrary and capricious.

i.      In numerous respects, the Rules, and particularly the provisions of 43 C.F.R. §§ 2361.10, 2361.40, are extraordinarily vague, lacking guidelines to avoid arbitrary and discriminatory application or enforcement, and are thus arbitrary and capricious, unlawfully vague, and contrary to constitutional right or privilege.

j.      The Rules create substantial uncertainty as to their application to existing leases, and activities necessary to support existing leases, including needed

**COMMPLAINT**
*ConocoPhillips Alaska, Inc. v. Department of the Interior, et al.*, 3:24-cv-00142
40
Case 3:24-cv-00142   Document 1   Filed 07/05/24   Page 40 of 45

exploration, right of way, and development activities. This uncertainty is contrary to the statutory purpose of the NPRPA to create investment certainty necessary for an expeditious leasing program and is arbitrary and capricious. Moreover, BLM's failure to appropriately respond to comments requesting clarification on the application of the rules to existing leases is also arbitrary and capricious. *See Ohio v. Env't Prot. Agency*, No. 23A349, 2024 WL 3187768, at *8 (U.S. June 27, 2024) (agency may not "sidestep" public comment).

k.      The Rules unlawfully conflict with, harm, and contradict existing lease rights and, accordingly, are not in accordance with law, arbitrary and capricious, and an abuse of discretion.

l.      BLM's economic analysis for the Rules incorrectly concludes that the Rules will not have a significant economic impact. BLM's economic analysis is insufficient and fails to consider numerous important aspects and consequences of the Rules, including the negative economic effects caused by the Rules. Relatedly, BLM's economic analysis fails to comply with Executive Order 12,866 by failing to disclose and analyze all economic impacts of the Rules and by failing to conclude that the Rules are economically significant. BLM also failed to comply with Executive Order 13,211 by failing to conclude that the Rules do not constitute a "significant energy action." BLM's reliance on its faulty economic analysis in promulgating the Rules is therefore arbitrary and capricious, not in accordance with law, and an abuse of discretion.

**COMPLAINT**
*ConocoPhillips Alaska, Inc. v. Department of the Interior, et al.*, 3:24-cv-00142

m.      BLM's reliance on FLPMA in promulgating the Rules is arbitrary and capricious, not in accordance with law, and an abuse of discretion.

n.      By defining "significant resource value" as "any surface value, including subsistence, recreational, fish and wildlife, historical, scenic, or other surface value that the Bureau identifies as significant and supports the designation of a Special Area," and creating various new regulatory requirements and obligations based on that definition, BLM has established a "multiple use" regulatory system for the NPR-A contrary to the NPRPA's dominant-use mandate, and the express instructions that multiple use planning "shall not be applicable to the Reserve." 42 U.S.C. § 6506a(c) Accordingly, the Rules are *ultra vires*, not in accordance with law, arbitrary and capricious, and an abuse of discretion.

o.      Taken as a whole, the Rules fundamentally and unlawfully change the primary purpose and management priority of the Petroleum Reserve as intended by Congress (*i.e.*, to expeditiously produce oil and gas) and, more broadly, fundamentally and unlawfully conflict with the NPRPA and Congress's intent in enacting the NPRPA. By granting BLM unfettered discretion to expand and designate Special Areas, creating a new presumption that oil and gas activities should not occur in Special Areas, and granting BLM unfettered discretion to condition, restrict, delay, deny, and prohibit oil and gas activities throughout the entire Petroleum Reserve, the Rules unlawfully convert the Petroleum Reserve into a de facto wilderness area and purport to manage the Petroleum Reserve for the purpose of limiting or preventing oil and gas development and

**COMPLAINT**
*ConocoPhillips Alaska, Inc. v. Department of the Interior, et al.*, 3:24-cv-00142
42
Case 3:24-cv-00142   Document 1   Filed 07/05/24   Page 42 of 45

reducing greenhouse gas emissions. This implicates a major federal question (thus requiring clear authorizing language from Congress), is beyond the scope of authority granted by Congress to BLM, and is contrary to Congressional intent and the plain language and purpose of the NPRPA.

134. For all of the reasons stated in this Complaint and in public comments opposing the Rules, the Rules violate the NPRPA and are arbitrary, capricious, an abuse of discretion, in excess of statutory limitations, not in accordance with law, without observance of the procedures required by law, contrary to constitutional right or privilege, and in excess of statutory jurisdiction and authority, in violation of the APA. Accordingly, the Rules should be vacated in their entirety.

## SECOND CLAIM FOR RELIEF

### (Violation of NEPA and APA)

135. Plaintiff incorporates by reference all preceding paragraphs of this Complaint.

136. In promulgating the Rules, BLM did not prepare an EIS or an EA.

137. BLM excluded the Rules from NEPA review by relying on BLM's CE at 43 C.F.R. § 46.210(i).

138. The Rules do not fall within the CE relied upon by BLM.

139. The Rules will result in less oil and gas exploration, development, and production in the Petroleum Reserve.

**COMPLAINT**
*ConocoPhillips Alaska, Inc. v. Department of the Interior, et al.*, 3:24-cv-00142
43
Case 3:24-cv-00142   Document 1   Filed 07/05/24   Page 43 of 45

140.    The Rules will result in reduced NPR-A mitigation funds to the State of Alaska and communities affected by development in the NPR-A.

141.    The Rules will have significant socio-economic impacts.

142.    The Rules will have other significant environmental impacts.

143.    The Rules establish new standards applicable to management of the NPR-A.

144.    The Rules adopt new official policy and substantially alter an existing regulatory program.

145.    The Rules violate NEPA because BLM failed to prepare an EIS or an EA, or to otherwise conduct any meaningful NEPA review, and unreasonably and arbitrarily relied upon its CE.

146.    For all of the reasons stated in this Complaint and in public comments opposing the Rules, the Rules violate NEPA and are arbitrary, capricious, an abuse of discretion, in excess of statutory limitations, not in accordance with law, without observance of the procedures required by law, and in excess of statutory jurisdiction and authority, in violation of the APA. Accordingly, the Rules should be vacated in their entirety.

## **PRAYER FOR RELIEF**

Plaintiff respectfully requests that the Court:

1.    Declare that BLM violated the APA, the NPRPA, and NEPA in promulgating the Rules, as set forth above;

**COMMPLAINT**

*ConocoPhillips Alaska, Inc. v. Department of the Interior, et al.*, 3:24-cv-00142

2.      Vacate the Rules;

3.      Enjoin the Rules, as necessary; and

4.      Grant such other relief as the Court deems just and proper.


DATED: July 5, 2024                          STOEL RIVES LLP


                                             /s/ Jason T. Morgan
                                             RYAN P. STEEN, Bar No. 0912084
                                             ryan.steen@stoel.com
                                             JASON T. MORGAN, Bar No. 1602010
                                             jason.morgan@stoel.com

                                             *Attorneys for Plaintiff ConocoPhillips
                                             Alaska, Inc.*

**COMPLAINT**
*ConocoPhillips Alaska, Inc. v. Department of the Interior, et al.*, 3:24-cv-00142
45